AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Irene Hickey Sullivan, (312) 353-5342

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:

The residential unit located at 12133 South Bishop Street, Chicago, Illinois, 60643 further described in Attachment A

Case No.

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Broc Verschoor, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, fruits, and contraband.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841 and 856 | Narcotics. |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_____
*Applicant's Signature*

BROC VERSCHOOR, Special Agent
Federal Bureau of Investigation
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: September 15, 2022

_____
*Judge's signature*

City and State: Chicago, Illinois

Jeffrey Cole, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT          )
                                      )
NORTHERN DISTRICT OF ILLINOIS         )

## AFFIDAVIT

I, Broc Verschoor, being duly sworn, state as follows:

1.     I am a Special Agent for the Federal Bureau of Investigation (FBI) and have been so employed since December of 2021. I am currently assigned to the FBI Gang Response Investigative Team (GRIT), a local, state, and federal task force focusing on drug and violent crimes in Northwest Indiana. While assigned to the GRIT task force, I have assisted numerous investigations involving narcotics, narcotics distribution, violent incident crimes, and criminal gang activity, as well as investigations involving child pornography.

2.     Based upon my training and experience, I am familiar with various investigative techniques, including, but not limited to, conducting physical, video, and visual surveillance; interviewing witnesses; monitoring controlled purchases of narcotics; reviewing documentary and physical evidence; and analyzing a wide variety of telephone records and data. I have also participated in investigations involving consensually monitored and consensually recorded telephone and in-person conversations involving informants. I have participated in the debriefing of informants, and others who have knowledge of the unlawful possession and distribution of controlled substances; money laundering related to these offenses; and conspiracies associated with controlled substance, illegal firearm possession, and money laundering offenses. I have been involved with confidential surreptitious

undercover recordings, electronic tracking devices, search warrants, Title-III wiretaps and other investigative techniques.

3.     This affidavit is made in support of an application for a warrant to search a residence located at 12133 South Bishop Street, Chicago, Illinois, described further in Attachment A (the "**Subject Premises**"), for evidence, instrumentalities, fruits, and contraband, described further in Attachment B, concerning the unlawful possession and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and using a place for the purpose of distributing controlled substances, in violation of Title 21, United States Code, Section 856 (the "**Subject Offenses**"). As set forth below, there is probable cause to believe that the **Subject Premises** contain, evidence, instrumentalities, fruits, and contraband, further described in Attachment B, concerning the **Subject Offenses.**

4.     The statements in this affidavit are based upon my personal knowledge and observations; my review of oral and written reports, audio and video recordings, documents, and other evidence obtained during the course of this investigation; information provided to me from a confidential source; and information received from other law enforcement personnel and persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, fruits, and contraband of violations of the **Subject Offenses** are located at the **Subject Premises**.

3

## I.      <u>FACTS SUPPORTING PROBABLE CAUSE TO SEARCH</u>

5.      During the course of the investigation, law enforcement agents with the FBI, DEA, and local authorities have learned that Marco SOLE ("SOLE") is a heroin dealer in the Chicago and northwest Indiana area. Based on information gathered from Confidential Source 2 (CS2)[1] and Confidential Source 3 (CS3)[2], SOLE utilizes the **Subject Premises** to further his narcotics trafficking enterprise. CS2 and CS3 positively identified SOLE through a photograph on August 6, 2021. Through fourteen controlled purchases utilizing the above-referenced CS2 and CS3, investigators with the FBI have collected over 765 grams of controlled substances (mainly heroin/fentanyl). Phone analysis has indicated that SOLE and other subjects are conspiring together to further drug trafficking activities in this area within the last six months.

### A.  CONTROLLED PURCHASE FROM MARCO SOLE ON SEPTEMBER 30, 2021

6.      On or about September 30, 2021, CS2 and CS3 participated in a controlled purchase from SOLE at the **Subject Premises**.

---

[1] CS2 agreed to cooperate with law enforcement in hopes of receiving leniency on his/her own potential cases. CS2's criminal history includes, but is not limited to arrests for battery, possession of controlled substance, gambling, escape and counterfeiting. CS2 has been convicted of possession of a controlled substance, gambling, forgery, and breed/training dog fighting. To date, CS2 has received no payment for working as a source.

[2] CS3 agreed to cooperate with law enforcement in hopes of receiving leniency on his/her own potential cases. CS3's criminal history includes, but is not limited to, arrests for theft, receiving stolen property, forgery, credit card fraud, resisting law enforcement, and obstructing justice. CS3 has been convicted of attempted theft, forgery and passing counterfeit obligations or securities. To date, CS3 has received no payment for working as a source.

7.     At approximately 12:34 p.m., law enforcement searched CS2 and CS3 and the CS's vehicle for excess monies and contraband, and none were found. Law enforcement provided CS1 with $4,000 in pre-recorded funds to purchase heroin from SOLE.

8.     At approximately 12:37 p.m. and 12:38 p.m., CS2 placed consensually recorded calls to SOLE at (312) 366-8702 that went unanswered.

9.     At approximately 12:53 p.m., law enforcement outfitted CS2 and CS3 with an audio/video recorder to be used during the meet with SOLE which allowed officers to monitor a live audio/video feed.

10.     At approximately 1:00 p.m., law enforcement established physical surveillance at the **Subject Premises**.

11.     At approximately 12:53 p.m., CS2 and CS3, while under constant surveillance, travelled to 20072 Terrace Avenue in Lynwood, Illinois— the residence listed on SOLE's driver's license—to make contact with SOLE in person.

12.     While enroute to the Lynwood residence, at approximately 1:13 p.m., SOLE, utilizing telephone number (708) 654-0032, called CS2 and arranged the purchase. Based on my training, experience, and knowledge of the investigation, I know the purpose of the above telephone call was for CS2 to ask for 50 grams of heroin from SOLE. SOLE directed CS2 to meet him at the **Subject Premises**.

13.     At approximately, 1:57 p.m., CS2 and CS3, while under constant surveillance, arrived at the **Subject Premises** for the controlled buy.

5

14. At approximately 1:59 p.m., law enforcement observed SOLE arrive at the **Subject Premises**, driving a brown/tan GMC van, license plate CF30391, and enter the **Subject Premises**. A short time later, law enforcement observed SOLE exit the residence and meet with CS2 at the CS's vehicle. According to CS2, CS3, and the audio and video recording, SOLE distributed the suspected heroin (approximately 52.2 grams) to CS2, in exchange for $4,000.

15. At approximately 2:08 p.m., CS2 and CS3, while under constant surveillance, departed the area of the **Subject Premises** and drove to a neutral location to meet with law enforcement.

16. At approximately 2:37 p.m., CS2 and CS3 arrived at the neutral location and handed law enforcement the recording device and suspected heroin. Law enforcement performed a field test and the substance tested positive for heroin and fentanyl. CS2 and CS3 and his/her vehicle were again searched for contraband, but none was found.

17. The substance was later sent to the DEA North Central Laboratory for analysis, and on or about February 23, 2022, confirmed to contain heroin and fentanyl.

## B. CONTROLLED PURCHASE FROM MARCO SOLE ON OCTOBER 20, 2021

18. On or about October 20, 2021, at approximately 12:09 p.m., CS2 placed a consensually recorded call to SOLE at (708) 654-0032 to arrange the purchase of heroin.

19.     Based on my training, experience, and knowledge of this investigation, I know the purpose of the above telephone call was for CS2 to ask for 50 grams of heroin from SOLE. SOLE directed the CS2 to meet him at "black," which law enforcement believes is a term used by SOLE to describe the **Subject Premises**.

20.     At approximately 12:13 p.m., law enforcement searched CS2 and CS3 and the CS's vehicle for excess monies and contraband, but none were found. Law enforcement then provided CS2 with $4,000 in pre-recorded funds to purchase the suspected heroin from SOLE.

21.     At approximately 12:19 p.m., law enforcement outfitted CS2 and CS3 with an audio/video recorder to be used during the meet with SOLE which allowed officers to monitor a live audio/video feed.

22.     At approximately 12:20 p.m., CS2 and CS3, while under constant surveillance, travelled to the **Subject Premises** to conduct the controlled purchase.

23.     At approximately 12:40 p.m., law enforcement initiated physical surveillance of the **Subject Premises**.

24.     At approximately 12:59 p.m., law enforcement observed SOLE arrive in a white Chevrolet sedan, IL plate CF58210, and enter the **Subject Premises**.

25.     At approximately 1:05 p.m., law enforcement observed SOLE exit the **Subject Premises** and meet with CS2 and CS3 at the CS's vehicle. According to CS2, CS3, and the audio and video recordings, SOLE distributed the suspected heroin to CS2 in exchange for $4,000. Law enforcement conducted physical surveillance at the **Subject Premises** for the duration of the controlled purchase.

7

26.     At approximately 1:07 p.m., CS2 and CS3, while under constant surveillance, departed the **Subject Premises** and drove to a neutral location to meet with law enforcement.

27.     At approximately 1:31 p.m., CS2 and CS3 arrived at the neutral location and handed law enforcement the recording device and suspected heroin. Law enforcement performed a field test and the substance tested positive for heroin and fentanyl. CS2 and CS3 and his/her vehicle were again searched for contraband, but none was found.

28.     The substance was later sent to the DEA North Central Laboratory for analysis, and on or about February 23, 2022, confirmed to contain heroin and fentanyl.

### C. CONTROLLED PURCHASE FROM MARCO SOLE AND CLINTON WILLIAMS ON FEBRUARY 23, 2022

29.     On or about February 23, 2022, investigators utilized CS2 to negotiate a heroin transaction with SOLE.

30.     At approximately 12:01 p.m., law enforcement met with CS2 and CS3 at a predetermined location. Law enforcement searched CS2 and CS3 and CS's vehicle for excess monies and contraband, but none were found. Law enforcement then provided CS2 with $4,000 in pre-recorded funds to purchase the suspected heroin from SOLE.

31.     At approximately 12:08 p.m., law enforcement outfitted CS2 and CS3 with an audio/video recorder to be used during the meet with SOLE which allowed officers to monitor a live audio/video feed.

8

32.     At approximately 12:09 p.m., CS2 and CS3, while under constant surveillance, travelled to 4617 Pennsylvania Street in Gary, Indiana (buy location) to conduct the controlled purchase. Upon arrival, CS2 and CS3 entered the residence.

33.     At approximately 12:17 p.m., CS2 called (312) 366-8702 to set up the transaction. This call was consensually recorded. Based on CS2's summary of the call and review of the recorded call, law enforcement believes SOLE knew that CS2 wanted 50 grams of heroin, based on previous controlled purchases, and agreed to meet CS2 at the buy location at 4617 Pennsylvania Street in Gary, Indiana.

34.     At approximately 2:10 p.m., law enforcement initiated physical surveillance of the **Subject Premises**.

35.     At approximately 2:42 p.m., surveillance units observed WILLIAMS arrive at the **Subject Premises.** WILLIAMS was identified by surveillance units utilizing a comparison of a known picture of WILLIAMS. Law enforcement maintained surveillance on WILLIAMS and eventually followed him from the **Subject Premises** to the buy location.

36.     At approximately 4:17 p.m., CS2 called SOLE at (312) 366-8702 to inquire about the timing and delivery of the suspected heroin. This call was consensually recorded. Based on CS2's summary of the call and review of the recorded call, during a portion of the call, law enforcement and CS2 heard SOLE talking to WILLIAMS directly and asking him to take the suspected heroin to CS2 in Indiana. Based on the call, CS2 believed SOLE sent Clinton WILLIAMS to deliver the heroin to CS2.

37.    At approximately 5:53 p.m., law enforcement observed a gold Cadillac, bearing IL license plate CX74021 and registered to SOLE, arrive at the buy location. WILLIAMS exited the vehicle and entered the buy location. Shortly thereafter, WILLIAMS exited the buy location and left the area in the Cadillac. According to CS2 and the audio and video recording, WILLIAMS met with CS2 and distributed the suspected heroin to CS2 in exchange for $4,000 cash. During the meeting, WILLIAMS provided CS2 with his cellular telephone number, (312) 391-0320. Law enforcement positively identified WILLIAMS by comparing him to known photographs when WILLIAMS was exiting the residence.

38.    Law enforcement conducted physical surveillance of WILLIAMS, who immediately after the transaction traveled to SOLE's residence in Lynwood, Illinois. Law enforcement believes that WILLIAMS was relaying the cash obtained in the controlled purchase to SOLE as it has become known throughout this investigation that WILLIAMS routinely works to support the drug trafficking operation at SOLE's direction. Furthermore, WILLIAMS' travel was direct from the purchase meeting location to SOLE's residence.

39.    At approximately 5:58 p.m., CS2 and CS3, while under constant surveillance, departed the buy location and drove to a neutral location to meet with law enforcement.

40.    At approximately 6:04 p.m., CS2 and CS3 arrived at the neutral location and handed law enforcement the recording device and suspected heroin. Law

10

enforcement performed a field test and the substance tested positive for fentanyl. CS2 and CS3 and his/her vehicle were again searched for contraband, but none was found.

41. Based on the discussion noted between SOLE and WILLIAMS while on the phone with CS2, as well as the observations made by physical surveillance, and the verbal agreement from SOLE to send WILLIAMS to the buy location, law enforcement believes that SOLE contacted WILLIAMS after the initial calls with CS2 to direct WILLIAMS to deliver the suspected heroin to CS3 in Indiana.

42. The substance was later sent to the DEA North Central Laboratory, Chicago, IL, for analysis and on or about April 28, 2022, and confirmed to contain heroin, fentanyl, p-fluorofentanyl, xylazine, and procaine.

### D. CONTROLLED PURCHASE FROM MARCO SOLE AND CLINTON WILLIAMS ON MARCH 15, 2022

43. On or about March 15, 2022, investigators utilized CS2 and CS3 to negotiate a heroin transaction with SOLE.

44. At approximately 12:07 p.m., law enforcement met with CS2 and CS3 at a predetermined location. Law enforcement searched CS2 and CS3 and the CS's vehicle for excess monies and contraband, but none were found. Law enforcement then provided CS2 with $4,000 in pre-recorded funds to purchase the suspected heroin from SOLE.

45. At approximately 12:26 p.m., CS2 called SOLE at (312) 366-8702 to set up the transaction.

46.     Law enforcement believes SOLE knew that CS2 wanted 50 grams of heroin, based on previous controlled purchases, and agreed to send WILLIAMS to meet CS2 at the buy location, at 4617 Pennsylvania Street in Gary, Indiana.

47.     At approximately 12:30 p.m., law enforcement outfitted CS2 and CS3 with an audio/video recorder to be used during the meet with SOLE which allowed officers to monitor a live audio/video feed.

48.     At approximately 12:37 p.m., CS2 and CS3, while under constant surveillance, travelled to 4617 Pennsylvania Street in, Gary, Indiana (buy location) to conduct the controlled purchase. Upon arrival, CS2 and CS3 entered the residence.

49.     At approximately 1:18 p.m. and 1:25 p.m., there were two calls between (708) 654-0032, a number CS2 had previously used to call SOLE, and telephone number (312) 391-0320, the number WILLIAMS previously provided to CS2, with durations of 37 seconds and 12 seconds respectively.

50.     Based on my training, experience, and knowledge of this investigation, I believe these short calls indicate SOLE contacted WILLIAMS to arrange for WILLIAMS to deliver drugs to CS2 on behalf of SOLE.

51.     At approximately 2:10 p.m., 708-654-0032 texted WILLIAMS at (312) 391-0320.

52.     At approximately 2:11 p.m., 708-654-0032 called WILLIAMS at (312) 391-0320.

53.     At approximately 2:12 p.m., 708-654-0032 called CS2 from telephone number (312) 391-0320.

12

54.     Based on my training, experience, and knowledge of the investigation, I believe that WILLIAMS was updating CS2 as to his location and arrival time to the buy location. I believe the text and call received by WILLIAMS from 708-654-0032 prompted this call, and that SOLE was directing WILLIAMS to touch base with CS2 regarding his whereabouts.

55.     Law enforcement conducted physical surveillance of WILLIAMS leaving the **Subject Premises** and followed WILLIAMS to the buy location.

56.     At approximately 1:52 p.m., law enforcement established surveillance on WILLIAMS, driving a Gold Cadillac Escalade, bearing Illinois license plate CX74021.

57.     At approximately 2:46 p.m., law enforcement observed a gold Cadillac Escalade, bearing Illinois license plate CX74021 and registered to SOLE, arrive at the buy location. Law enforcement observed WILLIAMS exit the vehicle and enter the residence. According to CS2, CS3, and the audio and video recording, WILLIAMS distributed the suspected heroin to CS2 in exchange for $4,000 cash. Law enforcement observed WILLIAMS exit the residence, enter the Cadillac, and leave the area.

58.     At approximately 2:51 p.m., CS2 and CS3, while under constant surveillance, departed the buy location and drove to a neutral location to meet with law enforcement.

59.     At approximately 2:56 p.m., CS2 and CS3 arrived at the neutral location and handed law enforcement the recording device and the suspected heroin. Law

enforcement performed a field test and the substance tested positive for fentanyl. CS2 and CS3 and his/her vehicle were again searched for contraband, but none was found.

60.     Based on toll records, discussion between CS2 and WILLIAMS, and the verbal agreement from SOLE to send WILLIAMS to the buy location, law enforcement believes that SOLE contacted WILLIAMS after the initial calls with CS2 to direct WILLIAMS to deliver the suspected heroin to CS3 in Indiana.

### E. CONTROLLED PURCHASE FROM MARCO SOLE AND CLINTON WILLIAMS ON MARCH 30, 2022

61.     On or about March 30, 2022, investigators utilized CS2 and CS3 to negotiate a controlled purchase of heroin from SOLE.

62.     At approximately, 2:01 p.m., law enforcement met with CS3 at a predetermined location. Law enforcement searched CS3 and CS's vehicle for excess monies and contraband, but none were found. Law enforcement then provided CS3 with $4,000 in pre-recorded funds to purchase the suspected heroin from SOLE.

63.     At approximately 2:03 p.m., law enforcement outfitted CS3 with an audio/video recorder to be used during the meeting with SOLE, which allowed officers to monitor a live audio/video feed.

64.     At approximately 2:15 p.m., CS3, while under constant surveillance, traveled to 4617 Pennsylvania Street in Gary, Indiana (buy location) to conduct the controlled purchase. Upon arrival, CS3 entered the residence.

65.     At approximately 2:17 p.m., CS2 called SOLE at (312) 366-8702 to set up the controlled purchase.  During this call SOLE stated, "let me call him and see where he at."

66. Law enforcement believes SOLE knew that CS2 wanted 50 grams of suspected heroin, based on previous controlled buys, and agreed to send WILLIAMS to meet CS2 and CS3 at the buy location, 4617 Pennsylvania Street in Gary, Indiana. Based on the comment made during the call that SOLE would "call him and see where he at," it is believed that SOLE intended to call WILLIAMS and direct him to meet CS2 at the buy location to sell drugs on behalf of SOLE.

67. At approximately 3:15 p.m., CS3 texted SOLE at 312-366-8702, utilizing CS2's phone as follows:

CS3: How long Clint gonna be?

68. At approximately 3:33 p.m., SOLE attempted to call CS2 using 312-366-8702. The call went unanswered. 312-366-8702 called WILLIAMS at (312) 391-0320 shortly thereafter for a duration of 35 seconds.

69. At approximately 3:34 p.m., CS2 called 312-366-8702 to return the previous call from SOLE.

70. Based on the timing of the calls, along with verified toll records, SOLE (using 312-366-8702) and WILLIAMS were connected to CS2 on a three-way call to discuss the arrival of WILLIAMS to the buy location. This conversation was consensually recorded.

71. During the call, SOLE, WILLIAMS, and CS2 discussed the following:

SOLE:       Hello.

CS2:        Yep, what's up?

15

SOLE:      He's on the phone with me, he how long you think Captain?

WILLIAMS: I'll be there (Unintelligible) in about twenty minutes.

SOLE:      So, about an hour D he'll be there. He got to come meet me, then (Unitelligible) twenty minutes.

WILLIAMS: Yeah, so about an hour.

CS2:      Alright.

WILLIAMS: I'm on my way bro.

CS2:      Alright.

SOLE:      Alright.

72.    Based on my training, experience, and knowledge of this investigation, I believe SOLE was coordinating timing, location, and expectations regarding when WILLIAMS would arrive at the buy location. I believe that SOLE stating "So, about an hour D he'll be there. He got to come meet me, then (Unintelligible) twenty minutes," indicated that WILLIAMS was on his way to the **Subject Premises** to pick up drugs to bring to the buy location.

73.    Law enforcement conducted physical surveillance of WILLIAMS prior to the controlled purchase. Law enforcement followed WILLIAMS from the **Subject Premises** to the buy location, located at 4617 Pennsylvania Street in Gary, Indiana.

74.    At approximately 5:20 p.m., law enforcement observed a gold Cadillac, bearing Illinois license plate CX74021 and registered to SOLE, arrive at the buy location. Law enforcement observed WILLIAMS exit the vehicle and enter the

16

residence. According to CS3 and the audio and video recording, WILLIAMS met with CS3 and distributed the suspected heroin to CS3 in exchange for $4,000 cash. WILLIAMS exited the residence and entered the Cadillac and left the area.

75.     At approximately 5:40 p.m., CS3, while under constant surveillance, departed the buy location and drove to a neutral location to meet with law enforcement.

76.     At approximately 5:46 p.m., CS3 arrived at the neutral location and handed law enforcement the recording device and suspected heroin. Law enforcement performed a field test and the substance tested positive for fentanyl. CS3 and his/her vehicle were again searched for contraband, but none was found.

77.     Based on toll records, the conversation between SOLE, WILLIAMS, and CS2, and the verbal agreement from SOLE to send WILLIAMS to the buy location, law enforcement believes that SOLE contacted WILLIAMS after the initial calls with CS2 to direct WILLIAMS to deliver the suspected heroin to CS3 in Indiana.

78.     The substance was later sent to the DEA North Central Laboratory for analysis, and on or about April 25, 2022, was confirmed to contain heroin, fentanyl, and xylazine.

F.  **CONTROLLED PURCHASE FROM MARCO SOLE ON APRIL 19, 2022**

79.     On or about April 19, 2022, investigators utilized CS2 and CS3 to negotiate a controlled purchase of heroin from SOLE.

80.     At approximately 12:09 p.m., law enforcement met with CS2 and CS3 at a predetermined location. Law enforcement searched CS2 and CS3 and CS's vehicle

17

for excess monies and contraband, but none were found. Law enforcement then provided CS2 with $4,000 in pre-recorded funds to purchase the suspected heroin from SOLE.

81.     At approximately 12:11 p.m., CS2 called SOLE at (312) 366-8702 to set up the controlled purchase.

82.     Law enforcement believes that SOLE knew CS2 was ordering 50 grams of heroin, based on previous controlled buys and that SOLE directed CS2 to come to the **Subject Premises**.

83.     At approximately 12:23 p.m., law enforcement outfitted CS2 and CS3 with an audio/video recorder to be used during the meet with SOLE which allowed officers to monitor a live audio/video feed.

84.     Shortly after, CS2 and CS3, while under constant surveillance, travelled to the **Subject Premises** to conduct the controlled purchase.

85.     At approximately 1:00 p.m., CS2 and CS3 arrived at the **Subject Premises** and parked on the street.

86.     At approximately 1:06 p.m., law enforcement observed SOLE exit the residence and approach the CS's vehicle. According to CS2, CS3, and the audio and video recordings, SOLE distributed the suspected heroin to CS2 in exchange for $4,000 cash. Shortly thereafter, CS2 and CS3, while under constant surveillance, departed the buy location and drove to a neutral location to meet with law enforcement.

87.     At approximately 1:32 p.m., CS2 and CS3 arrived at the neutral location and handed law enforcement the recording device and suspected heroin. Law enforcement performed a field test and the substance tested positive for heroin and fentanyl. CS2 and CS3 and his/her vehicle were again searched for contraband, but none was found.

## G. CONTROLLED PURCHASE FROM MARCO SOLE AT THE SUBJECT PREMISES ON MAY 10, 2022

88.     On or about May 10, 2022, investigators utilized CS2 and CS3 to negotiate a heroin transaction with SOLE.

89.     At approximately 12:04 p.m., law enforcement met with CS2 and CS3 at a predetermined location. Law enforcement searched CS2 and CS3 along with CS's vehicle for excess monies and contraband, but none were found. Law enforcement then provided CS2 with $3,800 in pre-recorded funds to purchase heroin from SOLE.

90.     At approximately 12:10 p.m., CS2 called SOLE at (312) 366-8702 to set up the controlled purchase. During the call, SOLE referenced being "in the kitchen."

91.     Based on previous controlled buys, law enforcement believes that SOLE knew CS2 was ordering 50 grams of suspected heroin and SOLE directed CS2 to come to the **Subject Premises**. According to CS2, based on a previous discussion CS2 had with SOLE, SOLE offered to sell the suspected heroin to CS2 for $3,800 instead of $4,000 if CS2 would drive to meet SOLE at the **Subject Premises**. Based on my experience with prior narcotics investigation and familiarity with the language narcotics traffickers use when discussing their activities, I believe that when SOLE

stated he was "in the kitchen," it meant he was mixing a new batch of heroin and fentanyl to sell.

92.     At approximately 12:33 pm., law enforcement outfitted CS2 and CS3 with an audio/video recorder to be used during the meet with SOLE which allowed officers to monitor a live audio/video feed.

93.     At approximately 12:35 p.m., CS2 and CS3, while under constant surveillance, traveled to the **Subject Premises** to conduct the controlled purchase.

94.     At approximately 1:16 p.m., CS2 and CS3 arrived at the **Subject Premises** and parked on the street. Law enforcement established physical surveillance at the **Subject Premises**.

95.     At approximately 1:22 p.m., law enforcement observed SOLE arrive at the **Subject Premises** in a white Chevrolet sedan, IL plate CF58210 and registered to SOLE. SOLE exited the passenger's seat of the vehicle and entered the residence. The white Chevrolet left the area.

96.     At approximately 1:25 p.m., law enforcement observed SOLE exit the residence and approach the CS's vehicle. According to CS2, CS3, and the audio and video recordings, SOLE distributed the suspected heroin in exchange for $3,800 cash. Shortly therafter, CS2 and CS3, while under constant surveillance, departed the buy location and drove to a neutral location to meet with law enforcement.

97.     At approximately 1:53 p.m., CS2 and CS3 arrived at a neutral location and handed law enforcement the recording device and suspected heroin. Law

enforcement performed a field test and the substance tested positive for fentanyl. CS2 and CS2 and his/her vehicle were again searched for contraband, but none was found.

### H. CONTROLLED PURCHASE FROM MARCO SOLE ON JUNE 2, 2022

98.    On or about June 2, 2022, investigators utilized CS2 and CS3 to negotiate a heroin transaction with SOLE.

99.    At approximately, 12:10 p.m., law enforcement met with CS2 and CS3 at a predetermined location. Law enforcement searched CS2 and CS3 and CS's vehicle for excess monies and contraband, but none were found. Law enforcement then provided CS2 with $4,000 in pre-recorded funds to purchase the suspected heroin from SOLE.

100.    At approximately 12:13 p.m., law enforcement outfitted CS2 and CS3 with an audio/video recorder to be used during the meet with SOLE, which allowed officers to monitor a live audio/video feed.

101.    At approximately 12:15 p.m., CS2 and CS3, while under constant surveillance, traveled to 4617 Pennsylvania Street in Gary, Indiana to conduct the controlled purchase. Upon arrival CS2 and CS3 entered the residence.

102.    Law enforcement conducted physical surveillance of SOLE prior to the controlled purchase. Law enforcement observed SOLE leave the **Subject Premises** and later conducted physical surveillance of the buy location, located at 4617 Pennsylvania Street, in Gary, Indiana.

103.    At approximately 2:14 p.m., law enforcement observed a brown/tan GMC van, bearing Illinois license plate CF30391 and registered to SOLE, arrive at

21

the **Subject Premises**. SOLE exited the vehicle and entered the residence. According to CS2 and the audio and video recordings, SOLE met with CS2 and distributed the suspected heroin to CS2 in exchange for $4,000 cash. SOLE exited the residence and entered the GMC van and left the area.

104. At approximately 2:20 p.m., CS2 and CS3, while under constant surveillance, departed the buy location and drove to a neutral location to meet with law enforcement.

105. At approximately 2:27 p.m., CS2 and CS3 arrived at the neutral location and handed law enforcement the recording device and suspected heroin. Law enforcement performed a field test and the substance tested positive for fentanyl. CS3 and his/her vehicle were again searched for contraband with negative results.

## I. OBSERVATIONS FROM COURT ORDERED WIRETAP: JUNE 28, 2022 – JULY 28, 2022

106. On or about June 28, 2022, the United States District Court for the Northern District of Indiana authorized the interception of wire communications over two telephones used by SOLE: the cellular telephone bearing the number (312) 366-8702 (TARGET TELEPHONE 1), and the cellular telephone bearing the number (708) 654-0032 (TARGET TELEPHONE 2). Interception commenced on or about June 29, 2022, at approximately 8:00 a.m. when the Court's Order was served on service provider AT&T, but due to technical issues, no calls were intercepted that day. The first intercepted conversation occurred on June 30, 2022, at approximately 9:16 a.m. Below are some pertinent calls and observations made during this time.

22

107. On June 30, 2022, at approximately 12:55 p.m., SOLE was observed on a pole camera as he exited the **Subject Premises** and left the area in a GMC van, bearing IL license plate CS38390, proceeding northbound on North Bishop Avenue. At approximately 1:02 p.m., SOLE was observed by physical surveillance as he arrived at 12343 South May Street, Calumet Park, Illinois, 60827 and parked on the East side of May Street. At approximately 1:04 p.m., an unidentified white female walked from the porch of 12343 South May Street to SOLE'S vehicle. At approximately 1:05 p.m., the unidentified female returned to the residence and SOLE drove away heading North on May Street.

108. Based on my training, experience, and knowledge of the investigation, I believe this was an arranged drug transaction between the unidentified female and SOLE, and based on approximate travel times from the **Subject Premises** to 12343 May Street, it is highly unlikely SOLE stopped anywhere between his departure from the **Subject Premises** and his arrival at the meeting location.

109. On July 4, 2022, at approximately 3:48 p.m., agents intercepted a drug related conversation between SOLE, who was utilizing TARGET TELEPHONE 1, and an Unidentified Male (UM1) who was utilizing telephone number ███████ During the call, SOLE and an unidentified male discussed the following:

> UM1: Bring me something man, I need something man. I'm telling you man.
>
> SOLE: What'd you mean?
>
> UM1: You know what I mean [UI].

SOLE: Done already?

UM1 Man, you already know. Come on man.

SOLE: How many you want?

UM1: Man, the same thing. That was all I could afford, shit.

SOLE: Alright.

UM1: Shit, goddamnit. You supposed to be looking out for your little brother [UI]. Give it up [UI]. [UI] real blessing [UI]. You know you're getting your [UI] back, this white [UI].

SOLE: Hey, I've been getting 'em to you's for forty.

UM1: Man, I know man, I'm just saying I'm on the floor right now. [UI] hard [UI] none of that shit. I need a hand down man.

SOLE: [UI] give it to you now

UM1: Where do you want me to meet you at?

SOLE: My uncle house on Bishop, 121st and Bishop. I'm finna to give you a 100 bro.

UM1: Alright. I'll be there in a bit.

SOLE: Alright, bring the most money you got bro. I'm finna to give you a 100 man.

110.    Based on my training, experience, and knowledge of this case I believe that SOLE was negotiating quantities of heroin (e.g., "100") and prices of heroin (e.g., "I've been getting 'em to you's for forty") SOLE was selling to UM1. SOLE instructed

UM1 to bring money to "121st and Bishop,"—the **Subject Premises**—a location where agents believe SOLE maintained his heroin.

111. On July 5, 2022, at approximately 7:50 p.m., law enforcement observed SOLE arrive at the **Subject Premises**. At approximately 7:59 p.m., SOLE departed from the **Subject Premises**. At approximately 8:03 p.m., SOLE arrived at 12343 South May Street, Calumet Park, Illinois 60827 and left a short time after.

112. Based on my training, experience, and knowledge of the investigation, I believe this was an arranged drug transaction between a resident of 12343 South May Street and SOLE. As mentioned above, SOLE has travelled from the **Subject Premises** to 12343 South May Street before and based on approximate travel times from the **Subject Premises** to 12343 May Street, it is highly unlikely SOLE stopped anywhere between his departure from the **Subject Premises** and his arrival at the meeting location.

113. On July 7, 2022, at approximately 5:08 p.m., law enforcement observed SOLE at the **Subject Premises** meeting with ███████████ and ███████████ in front of the residence. SOLE, ████████ and ████████ were identified by surveillance units through comparison to known photographs of each individual.

114. Law enforcement observed SOLE, ████████ and ████████ walking to and from SOLE's GMC van, bearing IL license plate CF30391, and the **Subject Premises**. Shortly thereafter, ████████ and ████████ left in their respective vehicles.

115. Law enforcement has observed ███████ on an active pole camera, as well as by surveillance units, frequenting the **Subject Premises** on numerous occasions. Law enforcement has also observed ███████ frequently walk up to numerous vehicles, with no known affiliation to the **Subject Premises**, parked on South Bishop Street, and interact with the vehicles' occupants for short periods of time before returning to the **Subject Premises**. Based on these observations and my training and experience, I believe that ███████ is dealing narcotics out of the **Subject Premises** on SOLE's behalf.

116. On July 23, 2022, at approximately 4:22 p.m., agents intercepted a drug related conversation between SOLE, who was utilizing TARGET TELEPHONE 1, and ███████ who was utilizing telephone number ███████ ██ ███████ is the subscriber for the number, and law enforcement has observed ███████ at the **Subject Premises** at times that correspond with his calls from the **Subject Premises**. During the call, SOLE and ███████ discussed the following:

SOLE: Need to get a couple t-shirts man.

███████ Aight, I'm pulling up.

SOLE: Alright.

117. At approximately 4:26 p.m., law enforcement monitoring the location of TARGET TELEPHONE 1 observed that TARGET TELEPHONE 1 was in the vicinity of the **Subject Premises**.

118.     Based on my training, experience, and knowledge of this case, I believe that SOLE was picking up heroin from ███████ at the **Subject Premises**. Law enforcement believes "t-shirt" is a term used to describe a quantity of heroin.

### J. POLE CAMERA OBSERVATIONS – SEPTEMBER 5, 2022 TO SEPTEMBER 12, 2022

119.     Law enforcement reviewed footage from an active pole camera positioned to capture the activity in front of the **Subject Premises.** During this review, law enforcement made the following observations.

120.     On September 5, 2022, at approximately 6:55 p.m., law enforcement observed SOLE on an active pole camera walking from the side of the **Subject Premises** around the front and entering the **Subject Premises** on its north side. At approximately 7:37 p.m., law enforcement observed SOLE outside the **Subject Premises** with an Unknown Male (UM2). At approximately 7:42 p.m., a second Unknown Male (UM3) approached SOLE and UM2. At approximately 7:44 p.m., SOLE entered the **Subject Premises** while UM2 and UM3 walked south on Bishop Street.

121.     Between September 6, 2022, and September 12, 2022, law enforcement observed ███████ (who had previously met with SOLE at the **Subject Premises** to distribute narcotics as explained above) visiting the **Subject Premises** frequently. Furthermore, multiple unknown individuals were observed entering and exiting the **Subject Premises,** with no known affiliation and for short durations of time, while ███████ was believed to be at or observed at the **Subject**

**Premises.** The following are observed comings and goings of ███████ and unknown individuals at the **Subject Premises** during this period.

122.     On September 6, 2022, ███████ entered the **Subject Premises** at approximately 8:50 p.m. and exited at approximately 9:14 p.m. ███████ returned at approximately 9:25 p.m. and again entered the **Subject Premises.**

123.     At approximately 10:38 p.m., two unknown males entered the **Subject Premises.** At approximately 10:40 p.m., one of the unknown males exited the **Subject Premises** and appeared to be holding a small plastic bag in his hand.

124.     Based on my training, experience, and knowledge of this investigation, it is my belief that during the events described above, ███████ is conducting drug transactions on behalf of SOLE at the **Subject Premises.** ███████ frequent coming and going from the **Subject Premises** for short durations of time, as well as the coming and going of other unknown individuals with no known affiliation with ███████ SOLE, or the **Subject Premises**, are indicative of drug trafficking activity. I believe the unknown male that walked out of the **Subject Premises** carrying what appeared to be a small plastic bag had just completed a drug transaction.

125.     On September 7, 2022, at approximately 8:34 a.m., ███████ exited the **Subject Premises.** An unknown male exited shortly thereafter. The unknown male walked around the front of the residence and then back into the **Subject Premises.** Between 8:45 a.m. and 5:20 p.m., ███████ came and went from the

28

**Subject Premises** at least five times. The duration of his visits to the **Subject Premises** ranged from five to twenty minutes.

126.    At approximately 6:38 p.m., ████████ returned to the **Subject Premises.** Law enforcement observed ████████ meeting with an unknown male in front of the residence. Shortly thereafter, ████████ and the unknown male entered the **Subject Premises**. At approximately 6:48 p.m., an unknown female entered the **Subject Premises.** At approximately 6:55 p.m., ████████ and the unknown female exited the **Subject Premises** and departed from the area. At approximately 8:21 p.m., ████████ entered the **Subject Premises** accompanied by the unknown female and two unknown males**.**

127.    On September 8, 2022**,** between approximately 7:52 a.m. and approximately 8:10 p.m., ████████ exited and entered the **Subject Premises** at least five times. Four of these visits lasted less than forty minutes.

128.    On September 9, 2022, at approximately 6:21 p.m., ████████ returned to and entered the **Subject Premises.**

129.    At approximately 6:22 p.m., an unknown female and two unknown males approached and entered the **Subject Premises.**

130.    At approximately 6:25 p.m., one of the unknown males walked out to meet another unknown male in front of the residence to the south of the **Subject Premises**. Both unknown males then entered the **Subject Premises.**

131.    At approximately 6:29 p.m., one unknown female and four unknown males exited the **Subject Premises**. Shortly thereafter, the four unknown males

departed in a dark sedan and the unknown female returned to the **Subject Premises.**

132.     At approximately 7:02 p.m., ███████ exited the **Subject Premises** and departed from the area.

133.     At approximately 7:44 p.m., an unknown male arrived at the **Subject Premises,** walked up to the front door, reached into the mailbox and appeared to retrieve something from it, and returned to his vehicle.

134.     At approximately 8:57 p.m., ███████ returned to and entered the **Subject Premises.** At approximately 10:24 p.m., ███████ exited and departed from the area.

135.     At approximately 10:52 p.m., ███████ returned to and entered the **Subject Premises.**

136.     Based on my training, experience, and knowledge of this investigation, I believe the unknown male that walked up to the front door of **Subject Premises** and retrieved an item out of the mailbox utilized the mailbox to complete a drug transaction.

137.     On September 10, 2022, at approximately 8:38 a.m., ███████ exited the **Subject Premises** and departed from the area.

138.     At approximately 9:06 a.m., ███████ returned to and entered the **Subject Premises.** At approximately 9:13 a.m., ███████ exited and departed from the area.

139.     At approximately 1:13 p.m., ██████ returned to and entered the **Subject Premises.** At approximately 2:02 p.m., ██████ exited and departed from the area.

140.     At approximately 2:02 p.m., two unknown males attempted to enter the **Subject Premises.** One unknown male was observed on the phone as both unknown males walked away from the **Subject Premises.**

141.     At approximately 3:24 p.m., ██████ returned to and entered the **Subject Premises.**

142.     At approximately 3:47 p.m., an unknown male exited the **Subject Premises** and walked north. The unknown male appeared to be holding a small item in his right hand.

143.     At approximately 3:48 p.m., the unknown male returned holding a mid-size envelope.

144.     Based on my training, experience, and knowledge of this investigation, I believe the unknown male observed walking out of view of the pole camera with an unknown item in hand and returning with an envelope conducted a drug transaction.

## II.     ADDITIONAL BACKGROUND INFORMATION

145.     Through training, experience, and discussions with other experienced agents, I know that:

a.     Drug traffickers commonly maintain books, papers, files, and other records which reflect the names, addresses and/or telephone numbers of their suppliers, couriers, customers, and other associates in the illegal drug trade.

31

b.      Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other files relating to the purchase, packaging, sale, distribution, and transportation of their product.

c.      Drug traffickers conceal in their residences, places of business, and/or stash houses the proceeds of their illegal activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, rare coins, works of art, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

d.      When drug traffickers amass large proceeds from the sale of controlled substances, they attempt to legitimize these profits, often accomplishing this goal by using the services of banks, other financial institutions, and real estate brokers; and maintain books and papers related to such efforts.

e.      It is common for drug traffickers to maintain the aforementioned books, papers, and documents in secure places within their residences, places of business, and/or stash houses so that the drug traffickers have ready access to such information.

f.      Drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates in the drug trade, property acquired from the distribution of drugs, and their product, and such photographs are often kept in their residences and/or places of business, on cellular devices, computers, laptops, or tablet devices/iPads. It is common practice for drug traffickers to conceal in their residences, places of business, and/or stash houses secure places to store the

contraband including but not limited to safes and that once a sizeable load of contraband has been delivered, to repackage and break-down larger quantities of illegal drugs into smaller more easily handled and concealed quantities for distribution; and that paraphernalia related to the packaging, cutting, weighing and distribution of contraband is usually secreted or stored in their residences, places of business, and/or stash houses.

       h.    Drug traffickers frequently possess firearms and ammunition to protect their illegal product.

146.   In addition, during the course of such residential and/or stash house searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

## **CONCLUSION**

147.    Based on the above information, I respectfully submit that there is probable cause to believe that evidence, instrumentalities, fruits, and contraband concerning the **Subject Offenses** are located at the **Subject Premises**. By this affidavit and application, I request that the Court issue a search warrant directed for the **Subject Premises**, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

Further, Affiant sayeth not.

Respectfully submitted,

BROC VERSCHOOR
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to and affirmed by telephone this 15th day of September, 2022.

Honorable Jeffrey Cole
United States Magistrate Judge
Northern District of Illinois

34

## ATTACHMENT A

The premises to be searched consists of a single-family house, located at 12133 South Bishop Street, in Chicago, Illinois ("**Subject Premises**"). The **Subject Premises** is a single-family house located on the east side of South Bishop Street with the front of the house facing South Bishop Street. The front of the building has a light-red brick face with white siding on the back of the house. The building has white shutters, a red front door with a black-rod metal screen door, a red awning over the front door and front-facing window, and a detached garage.

The property to be searched also includes any closed containers and storage areas located within the **Subject Premises**. Photographs of the premises are set forth below:



## **ATTACHMENT B**

Evidence, fruits and instrumentalities of violations Title 21, United States Code, Section 841(a)(1), possession with intent to distribute a controlled substance, and Title 21, United States Code, Section 856, using a place for the purpose of distributing controlled substances, including but not limited to:

1. Controlled substances, including but not limited to heroin and fentanyl, as well as packaging materials, scales, drug paraphernalia.

2. Proceeds of drug trafficking activities, including United States Currency, financial instruments, jewelry, and clothing. This includes recorded FBI official funds (buy money).

3. Books, records, receipts, notes, ledgers, airline tickets, money orders, money wire transfer receipts, rental car receipts, and other papers relating to the transportation, ordering, possession, sale, or distribution of controlled substances and/or the distribution of drug proceeds.

4. Personal telephone books, address books, telephone bills, photographs, videotapes, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities.

5. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records and other

documents noting the prices, quantity, and/or times when controlled substances were obtained transferred or sold distributed, and/or concealed.

6. Documents and deeds reflecting the purchase, lease, and/or ownership of real estate, vehicles, jewelry or other items obtained with the proceeds from organized criminal and drug trafficking activities.

7. Records of mail and communications services, and telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones, electronic organizers, caller identification devices, and other communication devices which evidence participation in organized criminal and drug trafficking activities.

8. Any objects that may contain any of the above evidence, including safes and/or vaults and the contents therein.

9. Any and all weapons, ammunition, bullet proof vests, or other materials used to protect the distribution of drugs and drug proceeds.

10. Any computers, cellular telephones, or mobile electronic devices, video surveillance DVRs, used by Marco SOLE or others in his drug trafficking organization, and the contents therein.

11. Evidence of residency, including but not limited to utility bills, purchase or lease agreements, and keys.